

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00079-CV

_____

IN THE INTEREST OF S.M. AND J.M., CHILDREN

On Appeal from the 393rd District Court
Denton County, Texas
Trial Court No. 22-1137-393

Before Bassel, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

### I. Introduction

This is an ultra-accelerated appeal[1] in which Appellant J.M. (Mother) appeals the termination of her parental rights to her daughter S.M. (Stella)[2] and her son J.M. (Jonathan) following a bench trial.[3] The trial court terminated Mother's parental rights based on clear and convincing evidence of three predicate grounds—endangering environment, endangering conduct, and failure to comply with her court-ordered service plan—and the best-interest ground. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (b)(2). In three issues, Mother challenges the legal and factual sufficiency of the evidence to support the predicate-ground findings and argues that she was wrongfully denied her right to a jury trial. Because legally and factually sufficient evidence supports the endangering-conduct finding and because the jury-trial denial constitutes harmless error, we affirm.

---

[1]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

[2]*See* Tex. R. App. P. 9.8(b)(2) (requiring court to use aliases to refer to minors in an appeal from a judgment terminating parental rights). Both children are referred to using aliases.

[3]The trial court also terminated the parental rights of Stella's father K.W. and Jonathan's unknown father. Neither appealed.

## II. Factual and Procedural Background

At the crux of this case is a mother whose history reveals untreated mental-health and substance-abuse issues and who has chosen to absent herself from her children's lives. Because we resolve Mother's predicate-ground challenges based on the endangering-conduct ground, we focus the background on facts relevant to that ground. And because Mother challenges the jury-trial denial, we begin by setting forth how the bench trial came about, and then throughout the summary of the trial testimony, we note Mother's counsel's questioning of the witnesses, as Mother did not attend the trial or put on any evidence.

### A. The Jury Trial Turned Bench Trial

Mother did not appear at the July 6, 2022 initial permanency hearing before final order; the trial court noted that Mother had been "incommunicado" with her counsel and was in jail in Florida. The trial court signed an order summarizing the status of the case; setting the docket call for January 20, 2023; and stating that failure to appear at the "docket call and/or trial may result in your cause being dismissed for want of prosecution."

When Mother did not appear at the January 20, 2023 docket call, the Department of Family and Protective Services (the Department or CPS) requested that the trial court strike her jury demand as well as any pleadings that she had on file. The trial court did not do so that day but stated that it would strike Mother's jury

demand and proceed to a bench trial if she failed to appear at trial, thus giving her another opportunity to appear.

At the outset of the termination trial, the Department noted that Mother was not present and re-urged its prior request to strike Mother's jury demand. The following discussion ensued:

THE COURT: Any position from anybody?

[MOTHER'S COUNSEL]: Judge, I don't have a position, as I've not been able to communicate with my client other than that initial period where I saw the answer and requested the jury demand. So I could not back off of that. Nor could I, you know, say anything different than that.

. . . .

THE COURT: I am advised repeatedly -- I am striking the -- in different pleadings and notices in bold letters that she failed to appear at either the docket call or when the case was called to trial.

Your pleadings are struck and your -- which includes any jury demand. And I am doing that. So her pleadings are struck[,] and her jury demand is struck. And we're going to proceed to a bench trial.

I will give -- since [Mother's counsel] is here, she will have the opportunity to challenge the [Department's] evidence as she is an attorney, but I think that's what her role at this point is limited to.

And with that, your first witness. I don't need openings.

## B.     The Referral and the Removal

Officer Jonathan Castro, a peace officer with the Lewisville Police Department, testified that he and Officer Christopher Holden discovered Mother and the children in a community park at approximately 9:30 p.m. on February 10, 2022, after receiving

4

a welfare-concern call. Officer Castro described the weather as "a little chilly" and said that he was wearing a jacket and a hat but that the children were dressed inappropriately for the weather. Officer Castro further described the children's appearance as follows: "It seemed like they had been wearing the same clothes for, I would imagine, several days. They were dirty. They had pieces of grass and leaves on them. They smelled like they hadn't showered in several days as well. So they seemed like they [had been] out in the elements for awhile." Officer Castro also noted that the children and Mother had nail polish on their entire faces "almost like a war paint type of design."

Officer Castro said that Mother was in "a trance-like state," seemed to be very disconnected with the situation, and kept looking up toward the sky. Mother was unresponsive to the officers, so they had to communicate with nine-year-old Stella and three-year-old Jonathan. The children told the officers that they had arrived in Texas from Michigan the week prior and had been staying in a homeless shelter near an apartment complex, but the officers were not able to locate a homeless shelter near the named apartment complex. When asked what plan, if any, Mother had to shelter the children, Officer Castro responded,

> From what I saw on scene, she had them on a bench in the open air covered in a, like, a bed sheet. And as far as supplies, she had a backpack with a carton of eggs, I believe [a] container of milk[,] and[] if I remember correctly, a small container of butter, if I'm not mistaken -- nothing that could be consumed in . . . their current situation.

5

Officer Castro testified that he and Officer Holden had concerns about Mother's and the children's safety because it was too cold for them to be out in the elements (and had the officers not checked on them, Officer Castro believed that Mother had planned to stay there overnight) and because it appeared that they had not eaten or bathed in some time and that they did not have "any kind of basic necessities." Based on these concerns, the officers transported Mother and the children to the hospital for evaluation. Mother appeared to be suffering from some type of mental-health episode, and it was determined that she was a danger to herself and was essentially unable to care for her children at that time. According to Officer Castro, "[A]n emergency protection was completed," and CPS was contacted. Mother's counsel did not question Officer Castro.

The CPS supervisor assigned to the case testified that she had received the case from the CPS night-response investigator. The night-response investigator met with Mother at the hospital and learned that her behavior was erratic, that she was not talking clearly, that there was concern for her mental state, that she had been placed on a mental-health hold, and that she did not have any family nearby to help with the children. Mother volunteered the name of a man, whom she had known for only twenty-four hours, to care for the children. Because the hospital would not allow the children to stay there and because no suitable placement was found, the children were placed in foster care. Mother's counsel did not question the CPS supervisor.

## C.      Mother's Service-Plan Noncompliance and Inconsistent Visits

The conservatorship worker testified that she had spoken with Mother at the conclusion of the original adversary hearing on February 25, 2022. Mother said that she had previously rented an apartment in Michigan but was living at a homeless shelter in Texas. The conservatorship worker learned that, despite Mother's assertions that she had no prior CPS history, she had prior CPS history in Michigan.

The conservatorship worker reviewed Mother's medical records before creating Mother's service plan. The records from Mother's hospital stay show that she had tested positive for marijuana. At the March 11, 2022 adversary hearing, Mother agreed to, among other services, undergo a psychological evaluation and a substance-abuse evaluation and to submit to random drug testing. Mother was asked to work with Hope's Door New Beginnings so that they could assist her with housing and identification documents, but Mother ended up leaving Hope's Door before they could assist her. Mother completed the substance-abuse evaluation, which recommended that she participate in intensive-outpatient drug treatment, but she did not complete the recommended treatment. Mother completed the psychological evaluation; the diagnosis was adjustment disorder with mixed anxiety and depression, and the recommendation was that she participate in individual counseling. Mother did not, however, follow the counseling recommendation. Mother was asked to follow up with MHMR to address her mental-health issues (which had necessitated a second hospitalization on March 1, 2022); at first, she said that she was told to wait on

that, and then she said that she had contacted MHMR and was told that there was nothing they could do for her. Mother never submitted to random drug testing. Mother never provided proof of income or a home address that the conservatorship worker could visit to assess its safety for the children. When asked what ways Mother had addressed her mental health and her drug use, the conservatorship worker responded, "To my knowledge, not at all."

The conservatorship worker said that out of the 200-plus visit opportunities that Mother had been given, Mother had attended only ten visits. The conservatorship worker testified that Mother had not exercised her in-person visitation since April 2022, and that she had not exercised her virtual visitations other than one virtual visit on September 1, 2022.[4]

The conservatorship worker later learned that Mother had been incarcerated in Florida during a portion of the time that she had not visited. Mother was arrested in Polk County for trespass after warning and was held on a warrant out of Osceola County for assault with a deadly weapon, petty theft, battery, and armed robbery. This information raised concerns because Mother had left the State of Texas without informing the Department and because she had been arrested for a violent crime.

---

[4]Mother reached out to the conservatorship worker on or about the night of October 8, 2022, requesting a visit for the following day—a Monday. The conservatorship worker responded that "it was too short of notice . . . to set up a visit" and that she would need to check the children's schedules but that Wednesday was possibly an option. Mother said that she would not be able to do visitation that day and never reached out again.

After Mother was released from jail, the conservatorship worker set up a virtual meeting, but Mother did not attend.

In August 2022, the conservatorship worker contacted Mother to inform her that the permanency goal in this case had changed from reunification to adoption by a relative, and Mother said that she was living in Michigan and was staying with a friend. Mother refused to provide any other details.

The conservatorship worker was part of the virtual visit on September 1, 2022. During the visit, Mother put on makeup and fixed her hair because she was getting ready to go out to dinner with her brother. Mother did not seem engaged with the children and had a "[v]ery surface conversation" with them, despite not having visited with them for five months. During the visitation, Jonathan urinated himself twice, and during the days following the visitation, Stella got into two altercations at school. As a result of the visitation's negative effects on the children, the ad litem filed a motion to modify the temporary orders to require Mother to contact her conservatorship worker to request visits, which would then occur on Wednesdays. After the trial court granted the motion, Mother did not request any visits. The conservatorship worker said that since October 2022, Mother's phone number had not been in service, and she had not responded to emails that the conservatorship worker had sent her.

Mother's counsel questioned the conservatorship worker about topics unrelated to the removal—whether Stella's father was charged for sexually assaulting

Mother when he impregnated Mother when she was thirteen, whether Mother had admitted that she was back in Michigan, whether Mother had transportation issues in Texas that prevented her from completing her services, and whether Mother and Stella were bonded at one point. Of note, the conservatorship worker stated, without objection, that Stella wanted to be adopted by Mother's cousin (Cousin).

### D. Cousin's Involvement with the Children

When Cousin learned from a relative that Mother, whom she had met years ago in Michigan,[5] was in Texas and was in the hospital, Cousin called Mother and asked if she wanted her to pick up the children so that they did not have to go into foster care; Mother told her to "just leave them and [to] let them go into foster care." After Mother was released from the hospital, she called Cousin and asked her to pick her up, and Mother stayed with Cousin for almost two weeks in February 2022. While Mother was in the home, she exhibited hostile behavior that scared Cousin's mother (who lived in the home at that time); after that, Cousin no longer permitted Mother to stay in her home.

After Mother was no longer residing in Cousin's home, CPS, as well as Mother and her attorney, called and asked if Cousin would be willing to allow the children to reside in her home; Cousin agreed. When the children were brought to Cousin's home in March 2022, Jonathan was initially "very closed off," but by the end of the

---

[5]Cousin testified that when the children lived in Michigan, they were cared for by a relative of Cousin's, and the relative was a heroin addict who had overdosed multiple times.

visit, he was talking and socializing. Cousin said that Stella was talkative, which is her personality.

Cousin testified that Mother was never consistent in her visits.[6] Cousin said that Mother's infrequent visits devastated Stella and caused Jonathan to need urging to talk to Mother because, according to Cousin, "[h]e doesn't have a bond with her." Cousin explained that it took weeks after a visit, even a virtual visit, for the children "to get . . . back on track to being not as clingy." Mother had not contacted Cousin since the September 2022 virtual visit, and Cousin did not know Mother's whereabouts at the time of the trial.

Cousin testified that the children love her and that she loves them and plans to adopt them.[7] Cousin testified that the children were doing "great" in school and have friends in the neighborhood.

---

[6]When Mother did visit by phone, she either talked about herself or did not talk. Cousin testified that

[Mother] has [Mother's] interest at heart. [Mother's] focus is on [Mother]. When [Mother] talks to the kids on the phone, [Mother's] whole conversation is about [Mother]. She directs her conversation about herself. It's -- everything is about her. It's never about the kids. Even when she calls them, she'll be on the phone[,] and she won't say a word. She'll just call and say nothing.

[7]The conservatorship worker testified that the children are thriving with Cousin. The conservatorship worker opined that Cousin is in a position to meet the children's needs and to provide them with stability and that it would be in the children's best interest for Mother's parental rights to be terminated.

Mother's counsel questioned Cousin about Mother's contact, or lack thereof, with her and about Mother's status as a ward when she gave birth to Stella.

## E. The Child-Advocacy Special Advocate (CASA) Volunteer's Recommendation

The CASA volunteer testified that she had visited the children monthly in Cousin's home since July 2022, that it was a clean and happy home, and that the children have everything they need. The CASA volunteer said that the children and Cousin have a loving relationship, that Cousin exhibits appropriate parenting abilities, and that CASA is in support of the children being adopted by Cousin. Mother's attorney questioned the CASA volunteer on her contact with Mother, and the volunteer said that she had sent a text to the phone number that she had for Mother but had never received a response.

## F. The Trial Court's Ruling

At the conclusion of the bench trial, the trial court stated its ruling:

The [c]ourt finds that the Department has established by clear and convincing evidence that the grounds of (D), (E)[,] and (O) have been established and finds by clear and convincing evidence that it's in the best interest of these children that [Mother's] parental rights be terminated.

The [c]ourt finds that the current placement . . . is appropriate, that the Department remain the now -- not temporary -- managing conservator of the children. The [c]ourt is not going to detail the record other than to say that this mother for at least nine months has not had any significant contact with her children even though she knows where they are, that this mother apparently has mental[-]health issues that she's not treating. She has an inability to have any sort of stable lifestyle through a job or a home.

12

And I'll just note the circumstances of these children at the time of the outset of this case where they were on a park bench exposed to the elements with no food, inadequate clothing, and Mother had no plan. And I think that sums it up.

The trial court signed an order terminating Mother's parental rights based on endangering environment, endangering conduct, and failure to comply with her court-ordered service plan, as well as on best interest.

### III.  Sufficient Evidence of Endangering-Conduct Finding

In her first issue, Mother argues that the trial court "erroneously found that these children were endangered[] when there was clearly insufficient evidence of that actually being the case." Later in her brief, Mother argues that the endangerment evidence "fell far short (both legally and factually)," so we treat her first issue as a legal- and factual-sufficiency challenge. Because the record demonstrates that Mother's past conduct subjected the children to a life of uncertainty and instability and because we may infer that similar conduct will recur if the children were returned to Mother, we conclude that legally and factually sufficient evidence supports the endangering-conduct predicate ground.

#### A.      Burden of Proof and Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence:  (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b);

13

*In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Subsection (b)(1)(M) allows a trial court to terminate the parental rights of a parent whose parent–child relationship with another child was terminated based on a finding under (D) or (E) (or an out-of-state-equivalent). Tex. Fam. Code Ann. § 161.001(b)(1)(M); *see id.* § 161.001(b)(1)(D), (E). Thus, when a parent challenges a Subsection (D) or (E) finding, due process and due course of law demand that we address the finding and detail our analysis. *In re N.G.*, 577 S.W.3d 230, 235, 237 (Tex. 2019); *see also In re C.W.*, 586 S.W.3d 405, 407 (Tex. 2019) (relying on *N.G.* and holding same); *see In re Z.M.M.*, 577 S.W.3d 541, 543 (Tex. 2019) (relying on *N.G.* to hold that the court of appeals erred by not addressing the father's sufficiency challenge to the trial court's Subsection (D) finding). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re*

14

*J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved that Mother endangered her children. Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

**B.    The Law on Conduct-Based Endangerment**

Subsection (E) requires a finding that the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the physical or emotional well-being of the child. Tex. Fam. Code Ann. § 161.001(b)(1)(E). To "'[e]ndanger' means to expose to loss or injury, to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re A.O.*, No. 02-

15

21-00376-CV, 2022 WL 1257384, at *8 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.).

Conduct-based endangerment under Subsection (E) requires more than a "single act or omission"; it requires a "voluntary, deliberate, and conscious course of conduct." *In re R.H.*, No. 02-20-00396-CV, 2021 WL 2006038, at *13 (Tex. App.—Fort Worth May 20, 2021, no pet.) (mem. op.). As a course of conduct, evidence of endangerment under Subsection (E) "is not limited to actions directed towards the child," *In re J.F.-G.*, 627 S.W.3d 304, 315 n.43 (Tex. 2021) (quoting *J.O.A.*, 283 S.W.3d at 345), and may include "actions before the child's birth, actions while the child is not in the parent's presence, and actions while the child is in the Department's custody." *See In re C.Y.*, No. 02-21-00261-CV, 2022 WL 500028, at *2 (Tex. App.—Fort Worth Feb. 18, 2022, pet. denied) (mem. op.).

As we have previously noted,

> As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See* [*In re*] *S.D.*, 980 S.W.2d [758,] 763[ (Tex. App.—San Antonio 1998, pet. denied)]. A factfinder may infer from past conduct endangering the well-being of the child that similar conduct will recur if the child is returned to the parent. *In re M.M.*, No. 02-08-00029-CV, 2008 WL 5195353, at *6 (Tex. App.—Fort Worth Dec. 11, 2008, no pet.) (mem. op.).

*In re M.B.*, No. 02-15-00128-CV, 2015 WL 4380868, at *12 (Tex. App.—Fort Worth July 16, 2015, no pet.) (mem. op.). We catalog some of the types of conduct that we can consider in an endangering-conduct analysis:

16

- Because a parent's illegal drug use exposes her child to the possibility the parent may be impaired or imprisoned, evidence of illegal drug use supports a finding that the parent engaged in a course of conduct that endangered the child's physical or emotional well-being. *See J.O.A.*, 283 S.W.3d at 345.

- While mere imprisonment, standing alone, will not constitute endangering conduct, when all of the evidence—including imprisonment—shows an endangering course of conduct, a finding under Subsection (E) is supportable. *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). "The [Department] need not show incarceration was a result of a course of conduct endangering the child; it need only show incarceration was *part of* a course of conduct endangering the child." *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.) (emphasis added).

- Additionally, "[a] parent's mental health is frequently considered in reviewing the sufficiency of the evidence under endangerment grounds." *In re J.P.-L.*, 592 S.W.3d 559, 583 n.26 (Tex. App.—Fort Worth 2019, pet. denied).

- Also as part of the endangering-conduct analysis, a court may consider a parent's failure to complete a service plan. *See In re R.F.*, 115 S.W.3d 804, 811 (Tex. App.—Dallas 2003, no pet.).

- Furthermore, a parent's lack of significant contact with a child may also endanger the child's physical or emotional well-being. *In re A.J.D.*, No. 02-13-00183-CV, 2013 WL 5781478, at *4 (Tex. App.—Fort Worth Oct. 24, 2013, no pet.) (mem. op.).

**C. Analysis**

Of these types of endangering conduct, the record contains evidence of each. As detailed above, the record shows that Mother's course of conduct endangered the children by, among other things, (1) testing positive for marijuana on the day the children were removed, refusing to take drug tests during the case (which are presumed positive),[8] and failing to participate in intensive-outpatient drug treatment as recommended in her substance-abuse assessment; (2) being hospitalized twice for mental-health episodes and failing to follow up with MHMR and the individual counseling recommended by her psychological evaluation; (3) absenting herself from her children's lives by attending only ten of 200 offered visits, by last visiting the children in person nine months before the trial, and by last visiting with them virtually four months before the trial; (4) failing to complete her service plan;[9] (5) being

---

[8] *See In re J.G.*, No. 02-21-00257-CV, 2022 WL 187983, at *9 (Tex. App.—Fort Worth Jan. 20, 2022, no pet.) (mem. op.) (stating that parent's failure to test authorized the trial court to presume that if he had tested, the results would have been positive).

[9] Even in her second issue challenging Subsection (O)—the service-plan compliance ground—Mother does not contend that she completed the services on her service plan but instead argues only that she did not abuse or neglect her children.

18

charged with numerous crimes—some of which were violent crimes—and spending time in a Florida jail while the case was pending; and (6) failing to establish stable housing. Moreover, Mother did not appear for the trial, and her attorney and the Department did not know her whereabouts as Mother had stopped responding to their emails and no longer had a working phone number. This conduct, which demonstrates a failure to establish a stable home and maintain contact, can be presumed to continue in the future, thus subjecting the children to a life of uncertainty and instability that endangers the children's physical and emotional well-being.

Despite this evidence demonstrating that Mother had exhibited multiple types of endangering conduct, Mother argues that the evidence presented failed to raise more than mere conjecture, surmise, or suspicion that the children might be exposed to a risk of harm or "might[] potentially be injured"—essentially arguing insufficient proof of endangerment—but attempts to support her argument by focusing solely on the facts alleged in the affidavit of removal and the allegedly negative effects that the removal and foster care had on the children. Mother gives examples of endangering behaviors, such as setting a house on fire with the children in it or physically abusing

---

Additionally, Mother does not argue on appeal that she was unable to comply with her services due to indigency, but for clarity we note, as the Department did in its brief, that "the issue in this case was not [Mother's] indigency[] but rather [her] refusal to get help for her mental health, living situation, and unemployment." As set forth above, Mother abandoned the Department's offered help to assist her with shelter and with obtaining identification documents to gain employment and instead left the state.

children, and argues that "[t]aking children to a park and then[] suffering chest pains[10] is not of the same ilk as those." Mother wholly ignores the specific endangering conduct that she committed, as detailed above.

Mother also argues that "this is not a drug case"; that the State must "make it absolutely clear that the parent's drug usage has threatened or harmed the child to a measure whereby termination of the family becomes a possibly reasonable option, even though it is extreme"; and that drug use "is not, on its own, sufficient evidence of endangerment." Here, Mother's drug use is not the sole evidence of endangerment. Moreover, as set forth above, case law holds that because a parent's illegal drug use exposes her child to the possibility the parent may be impaired or imprisoned, evidence of illegal drug use supports a finding that the parent engaged in a course of conduct that endangered the child's physical or emotional well-being. *See J.O.A.*, 283 S.W.3d at 345.

On this record, a reasonable factfinder—whether viewing the evidence in the light most favorable to the judgment or weighing all of the disputed evidence, *see In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018)—could have formed a firm belief or conviction that Mother's course of conduct endangered the children's well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E); *In re J.M.*, No. 02-21-00346-CV, 2022 WL 872542, at *13 (Tex. App.—Fort Worth Mar. 24, 2022, no pet.) (mem. op.) (holding

---

[10]Although not mentioned in the trial testimony, the CPS night-response investigator's affidavit that was admitted into evidence noted that Mother had "complained of pain in her chest" when she was found in the park.

evidence legally and factually sufficient to enable the trial court to form a firm belief or conviction that mother had engaged in conduct that had endangered the children when mother tested positive for drugs at child's birth, failed to submit to random drug tests, failed to complete services, and was charged with theft while the termination case was pending); *cf. In re M.K.*, No. 02-19-00459-CV, 2020 WL 1949629, at *4–7 (Tex. App.—Fort Worth Apr. 23, 2020, no pet.) (mem. op.) (holding evidence legally and factually sufficient to support endangerment findings when the evidence demonstrated unstable housing, drug use and the failure to submit to drug tests, the failure to work services, the failure to visit the child for over a year, and multiple arrests with the potential for incarceration). We overrule the portion of Mother's first issue challenging the endangering-conduct ground in Subsection (E).[11]

## IV. Harmless Jury-Trial Denial

In her third issue, Mother argues that she was wrongfully denied a jury trial. We assume for purposes of the appeal that Mother was entitled to have the case remain on the jury docket.[12] *See In re A.B.*, No. 02-22-00112-CV, 2022 WL 2526942,

---

[11]Because a finding of only one ground alleged under Section 161.001(b)(1), plus the unchallenged best-interest ground, is sufficient to support termination, *see In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003), we need not address the remainder of Mother's first issue challenging Subsection (D)—endangering environment—or Mother's second issue challenging Subsection (O)—her failure to comply with the court-ordered service plan. *See* Tex. R. App. P. 47.1.

[12]Although we assume for purposes of our analysis that the case should have remained on the jury docket, we question whether the case should have ever been set on the jury docket. As discussed in the Department's brief, "[w]hile [Mother] filed

21

at *2 n.3 (Tex. App.—Fort Worth July 7, 2022, no pet.) (mem. op.) (citing *J.G.*, 2022 WL 187983, at *3). Mother does not include a harm analysis in her brief, arguing instead that a traditional harm analysis is not required and that there is "presumed harmfulness." Mother notes in her brief that this court has previously considered this issue and has held against the position that she argues, but she quotes one of our prior opinions in which we stated that it is "a rare situation where harm has not been shown and the holding in this case should be limited as such." *See J.G.*, 2022 WL 187983, at *6 (quoting *In re J.M.*, No. 12-19-00353-CV, 2020 WL 1528054, at *11 (Tex. App.—Tyler Mar. 31, 2020, no pet.) (mem. op.)); *see also A.B.*, 2022 WL 2526942, at *2. Because this case presents the same scenario as *A.B.* and *J.G.*—a parent who failed to present any evidence at trial—we have found another rare situation where harm has not been shown.

---

her jury demand inside of her [o]riginal [a]nswer, there is nothing in the record that [Mother] either paid a jury fee or filed a [R]ule 217 affidavit of indigence." *See* Tex. R. Civ. P. 217. By failing to comply with Rules 216 and 217, Mother failed to perfect her jury demand. *See* Tex. R. Civ. P. 216, 217; *In re B.T.G.*, No. 05-16-00370-CV, 2017 WL 3392879, at *3 (Tex. App.—Dallas Aug. 8, 2017, pet. denied) (mem. op.) (holding that Rule 145 affidavit of indigency filed at the beginning of the case was not sufficient because it did not prove husband's inability to pay the jury fee or to obtain the necessary funds). This is an alternative ground on which Mother's third issue fails. *See B.T.G.*, 2017 WL 3392879, at *4 ("Because Husband has not shown that he timely paid the jury fee or timely submitted a proper Rule 217 affidavit, we conclude that he has not shown that the trial court abused its discretion by denying his jury request."). But because the trial court proceeded as if a jury trial had been properly requested and then struck the jury demand due to Mother's failure to follow certain pretrial orders, we also analyze Mother's third issue in light of that procedural scenario.

Like most judicial errors, the wrongful denial of a jury trial is subject to harmless-error review. *See* Tex. R. App. P. 33.1; *Halsell v. Dehoyos*, 810 S.W.2d 371, 372 (Tex. 1991); *A.B.*, 2022 WL 2526942, at \*3. "A refusal to grant a jury trial is harmless error only if the record shows that no material issues of fact exist and an instructed verdict would have been justified." *Halsell*, 810 S.W.2d at 372. Accordingly, we look to see if the record reveals the existence of any material fact issues and whether an instructed verdict would have been justified.

Having done so, no disputed issues of material fact exist for resolution by a factfinder. The record shows that the Department put on six witnesses: a business-records custodian, Cousin, the police officer, the CPS supervisor, the CASA volunteer, and the conservatorship worker. Mother did not appear at trial; thus, she did not testify. Other than cross-examining some of the Department's witnesses, as noted above, Mother presented no evidence at all.

As demonstrated in the predicate-ground analysis above, the Department put on legally and factually sufficient evidence of Mother's endangering course of conduct. The Department's evidence was thus sufficient to establish termination under predicate ground (E). Mother did not raise an issue on appeal challenging the legal or factual sufficiency of the best-interest ground but argues within her jury-trial-denial issue that the best-interest ground "requires a factual determination" and that

23

the factual determinations about the *Holley* factors[13] "must be made, regardless of what, if any, evidence . . . [M]other chose to present." Mother's argument, at its core, is that the best-interest ground inherently encompasses material fact issues for a jury to decide. Mother, however, has not pointed to any specific evidence or testimony that she believes raised a material fact issue as to the best-interest ground. Moreover, the Department presented sufficient evidence of the relevant *Holley* factors: testimony came in without objection that Stella wanted to be adopted by Cousin and that Jonathan was not bonded to Mother; Cousin was able to meet the emotional and physical needs of the children now and in the future, while Mother could not; Mother's endangering conduct demonstrated that she posed an emotional and physical danger to the children, that she lacked adequate parenting abilities, and that the existing parent–child relationship was not a proper one; Mother had failed to take advantage of the programs on her service plan; and Mother's plans for the children remained unknown because she had not communicated with the Department since October 2022 and had not provided an address for the Department to evaluate for its suitability for the children, nor had she shown stability during the case. The Department representatives and the CASA volunteer were of one accord on recommending termination and adoption by Cousin as being in the children's best

---

[13] *See generally Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (listing factors).

interest. The record thus does not contain conflicting evidence on the best-interest factors.

Based on the record before us, there is no conflicting evidence of probative value. Had Mother's jury demand not been struck, the Department would have been entitled to seek a directed verdict asking the court to render judgment without submitting a charge to the jury because there is nothing for a jury to decide. *See A.B.*, 2022 WL 2526942, at *3. And the trial court would have been justified in granting such a motion.

Accordingly, we conclude that the trial court's improper denial of the jury demand constitutes harmless error. *See id.*; *J.G.*, 2022 WL 187983, at *6; *J.M.*, 2020 WL 1528054, at *11. We therefore overrule Mother's third issue.

## V. Conclusion

Having overruled the dispositive portion of Mother's first issue and having overruled her third issue, we affirm the trial court's judgment terminating Mother's parental rights to Stella and Jonathan.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: July 13, 2023

25